# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

Marcia Stubblefield
                    Plaintiff(s)

vs.

Case Number: 18 CV 337 TCK - JFJ

Seneca Companies
                    Defendant(s)

**FILED**
JUN 29 2018
Mark C. McCartt, Clerk
U.S. DISTRICT COURT

**COMPLAINT - EEOC**

Comes now the Plaintiff, __Marcia Stubblefield__ and for his/her claim against the Defendant(s), __Seneca Companies__ states and alleges as follows:

1. This action is brought and jurisdiction lies pursuant to 42 U.S.C. §2000e-5. Venue is proper in this District.

2. Plaintiff is a(n) __White__ (Race) __Female__ (Sex) who resides at __4001 E. 11th Place, Tulsa OK 74112__ (Complete address)

3. The Defendant __Seneca Companies__ is an employer, employment agency, or labor organization, as defined in 42 U.S.C. §2000e, and is located at __6947 E. 13th Street, Tulsa OK 74112__

*(Note: 3a-3f to be used if there is more than one defendant.)*

3a. The Defendant _____ is an employer, employment agency, or labor organization, as defined in 42 U.S.C. §2000e, and is located at _____

3b. The Defendant _____ is an employer, employment agency, or labor organization, as defined in 42 U.S.C. §2000e, and is located at _____

3c. The Defendant _____ is an employer, employment agency, or labor organization, as defined in 42 U.S.C. §2000e, and is located at _____

3d. The Defendant _____ is an employer, employment agency, or labor organization, as defined in 42 U.S.C. §2000e, and is located at _____

Complaint                                    1

3e. The Defendant _____ is an employer, employment agency, or labor organization, as defined in 42 U.S.C. §2000e, and is located at _____

3f. The Defendant _____ is an employer, employment agency, or labor organization, as defined in 42 U.S.C. §2000e, and is located at _____

4. On or about __April 07__, __2014__, defendant(s)
             (Month/day)    (Year)

(Specify the unlawful employment practices which you are alleging against the defendant(s), such as: refusal to hire, discharge from employment, harassment in employment, etc.)

Discrimination & retaliation was not an isolated event that took place from my hire date of 04/07/2014 through my termination of employment 04/02/2015.  The unlawful employment practices are harassment, retaliation, hostile work environment, termination of employment,  discrimination based on sex and genetic information

because of (state why defendant(s) discriminated against you, i.e. race, color religion, sex or national origin, etc.)

Discrimination based on sex and ethnic genetic information (GINA).

5. Plaintiff timely filed a written complaint of discrimination with the Equal Employment Opportunity Commission (EEOC) and received a right to sue letter, a copy of which is attached. All conditions precedent to the institution of this lawsuit have been fulfilled.

Wherefore, Plaintiff prays for (state what relief is sought)  Relief of back pay, front pay and interest.  Punitive damages for defendant reckless indifference.  While employed with Seneca Companies and these following years, I have suffered from mental anguish, emotional distress, anxiety, depression and loss of enjoyment of life and career.

and such other relief as the Court would allow under Title VII of the Civil Rights Act of 1964.

*Marcia Stabblyfield*
Signature

4001 E. 11th Place
Address

Tulsa                                          OK        74112
City                                          State      ZIP

918-938-9747 / 918-520-8422
Telephone

ST. LOUIS DISTRICT OFFICE
**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
ROBERT A. YOUNG BLDG., ROOM 8.100
1222 SPRUCE STREET
ST. LOUIS, MISSOURI 63103

OFFICIAL BUSINESS



$ 000.47⁰
02 1P
0000806092   APR 04 2018
MAILED FROM ZIP CODE 63103

**Marcia Stubblefield**
**4001 E. 11th Place**
**Tulsa, OK 74112**

74112-511301

EEOC Form 161 (11/16)      **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| **To:** Marcia Stubblefield<br>4001 E. 11th Place<br>Tulsa, OK 74112 | **From:** St. Louis District Office<br>1222 Spruce Street<br>Room 8.100<br>Saint Louis, MO 63103 |

[ ]    *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 31B-2015-00118 | Joseph J. Wilson,<br>State & Local Program Manager | (314) 539-7816 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[X] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other *(briefly state)*

- NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Enclosures(s)     _____ James R. Neely, Jr., Director _____     April 4, 2018 *(Date Mailed)*

cc:

**Chief Executive Officer**
**SENECA COMPANIES**
6947 E. 13th Street
Tulsa, OK 74112

Espnola Cartmill
**BELIN MCCORMICK**
666 Walnut St., Suite 2000
Des Moines, IA 50309

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA [X] EEOC | CR-15-0070-E 31B-2015-00118 |

Oklahoma Attorney General's Office, Office of CR Enforcement         and EEOC
*State or local Agency, if any*

Name (indicate Mr., Ms., Mrs.): **Ms. Marcia Stubblefield**
Home Phone (Incl. Area Code):
Date of Birth:

Street Address: 4001 E. 11th Place, Tulsa, OK 74112

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

Name: **SENECA COMPANIES**
No. Employees, Members: Unknown
Phone No (Include Area Code): (918) 838-0494

Street Address: 6947 E. 13th Street, Tulsa, OK 74112

DISCRIMINATION BASED ON (Check appropriate box(es)):
[ ] RACE  [ ] COLOR  [X] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN
[X] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] GENETIC INFORMATION
[ ] OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 04-07-2014    Latest: 04-02-2015
[ ] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I believe I have been discriminated against on the basis of my sex, and have suffered retaliation for the following reasons:

1) Beginning in early 2014, my then co-worker, Tom Hayes, subjected me to sexual harassment that resulted in an offensive and hostile work environment. Specifically, despite my objection, Mr. Hayes made sexually offensive comments to me about his personal sex life, showed me an inappropriate image of his wife, told sexually offensive stories to me in the presence of male co-workers, encouraged me to expose my breasts, and used a derogatory term in reference to my breasts. In late September or early October 2014, Mr. Hayes became my immediate supervisor.

2) On approximately October 20, ~~2015~~ 2014, I engaged in protected activity and demonstrated my opposition to Mr. Hayes' conduct by placing a formal complaint with Respondent's Human Resources Director, Matt Puffer. I reported the unwanted sexual harassment, general mistreatment

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

Date: 05/26/15    Charging Party Signature: *Marcia Stubblefield*

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT: *Marcia Stubblefield*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)
May, 26, 2015

[OFFICIAL SEAL — TAYLOR BUDD, NOTARY PUBLIC OKLAHOMA, TULSA COUNTY, COMM. EXP. 06-17-2017, COMM. NO. 13005697]

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To:<br>[X] FEPA<br>[X] EEOC | Agency(ies) Charge No(s):<br>CR-15-0070-E<br>31B-2015-00118 |
|---|---|---|

**Oklahoma Attorney General's Office, Office of CR Enforcement** and EEOC
*State or local Agency, if any*

unethical business practices, and the hostile work environment. During the internal investigation, Mr. Hayes admitted to his wrongful conduct. However, after I engaged in protected activity I was systematically targeted. Specifically, in March 2015, an internal investigation revealed my email account was hacked into and several files and folders were deleted. Also, despite being my direct supervisor, Mr. Hayes ignored my requests for assistance and failed to remedy incorrect cost allocations.

3) On approximately April 2, 2015, Mr. Hayes called me into his office and Mr. Puffer terminated me on behalf of Respondent. The reason given for my termination related to my performance numbers. Prior to my termination, I was never coached, trained, consulted, or disciplined regarding issues with my performance.

---

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

05/26/15  *Marcie [signature]*
Date    Charging Party Signature

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT
*Marcie [signature]*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)
May, 26, 2015

[Notary Seal: TAYLOR BUDD, NOTARY PUBLIC, OKLAHOMA, TULSA COUNTY, COMM. EXP. 06-17-2017, COMM. NO. 13006697]

Enclosure with EEOC
Form 161 (11/16)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do **not** relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***

## Marcia Stubblefield

I believe I have been discriminated again on the basis of my sex, and have suffered retaliation, intimidation and general mistreatment for the following reasons:

1) Beginning in early 2014, my then co-worker, Mr. Tom Hayes, subjected me to sexual harassment that resulted in an offensive and hostile work environment. Specifically, despite my objection, Mr. Hayes made sexually offensive comments to me about his person sex life, showed me an inappropriate image of his wife, told sexually offensive stories to me in the presence of male co-workers, encouraged me to expose my breasts, and used a derogatory term in reverence to my breasts. In late September or early October 2014, Mr. Hayes became my immediate supervisor.

2) On approximately October 20, 2014, I engaged in protected activity and demonstrated my opposition to Mr. Hayes' conduct by placing a formal complaint with Seneca Companies Human Resources Director, Mr. Matthew Puffer. I reported the unwanted sexual harassment, general mistreatment, unethical business practices, and the hostile work environment. During the internal investigation, Mr. Hayes admitted to his wrongful conduct. However, after I engaged in protected activity, I was systematically targeted. Specifically, In March 2015, an internal investigation revealed my email and prospect/customer database account was hacked into and several files, emails, and folders were deleted. Also, despite being my direct supervisor, Mr. Hayes ignored my requests for assistance and failed to remedy incorrect cost allocations.

3) On approximately April 2, 2015, Mr. Hayes called me into his office and Mr. Puffer terminated me on behalf of Mr. Hayes and Seneca Companies. The reason given for my termination related to my performance numbers. Prior to my termination, I was never coached, consulted or disciplined regarding issues with my performance.

**The following are the specific details related to my claim:**

I. In February 2014, I finished my first job interview with Seneca Companies and Mr. Hayes entered the room. Mr. Hayes turned off the equipment stating that he did not want anyone listening in on our conversation. Mr. Hayes stated he could make me or break me, as well as commented that there will be companies that will refuse to do business with me because I am a woman. Mr. Hayes stated that no one should ever tell him no because he had the backing of the owner of the company.
II. On approximately April 8, 2014, Mr. Biellier, GM Seneca Companies Waste Solution Division, stated to never take credit nor receive commissions on a project that was not assigned to me. It would cause immediate termination, no questions asked.

III. On approximately April 15, 2014, I was training with Mr. Conger, a coworker, in the Tulsa Branch. Mr. Hayes yelled at me, reason unknown and he stormed out of his office.

IV. On approximately April 16, 2014, Mr. Hayes stated he wanted to be the sales person for Seneca Companies and insisted he deserved all the commission for the Tulsa branch.

V. On approximately April 17, 2014, I was chastised by Mr. Charles, Seneca Companies Waste Solutions sale representative Denver Market, for wearing heels to a lunch meeting with Koch Nitrogen.

VI. On approximately April 18, 2014, Mr. Hayes changed a meeting start time with Baker Tank. Mr. Hayes neglected to inform me of the meeting change. When I arrived, Mr. Hayes glared at me and prevented me from participating in the meeting. Mr. Shultz, Seneca Companies Waste Solutions division field technician, was in the meeting.

VII. On approximately April 18, 2014, Mr. Hayes stated IC Bus wanted a single point of contact and that contact will be Mr. Hayes. Throughout my tenure with Seneca Companies, Mr. Hayes continued to intervene with my progress with IC Bus.

VIII. On approximately April 23, 2014, Mr. Hayes and I attended a day trip to the ISNet World Conference in Oklahoma City. During the conference, Mr. Hayes continued to comment that he thought I was interested in a gentleman wearing a cowboy hat and boots. I ignored his comments. I removed myself from sitting next to Mr. Hayes. To avoid Mr. Hayes during the conference, I stood in the back of the room. While in Mr. Hayes vehicle and driving back to Tulsa after the conference ended; Mr. Hayes called his wife on speaker phone. Mr. Hayes stated to his wife that I was flirting with a cowboy and after the conference, I grabbed the cowboy's hand and lead him up to a hotel room. I immediately stated this was untrue.

IX. On approximately May 1, 2014, Mr. Hayes told me that ISTI was a Mexican company and that they did not want to deal with a woman. Mr. Hayes stated he would be the only contact person for this account.

X. In May 2014, I received an email from Mr. Conger, Seneca Companies Waste Solutions division sales representative, with an attachment for dry ice and equipment rental pricing to use for quotes. Unknown to me the pricing was two years old, therefore, my completed customer project was below margin. I contacted Mr. Conger regarding the email I received with old pricing and he stated he did not remember sending me the email.

XI. On approximately May 14, 2014, while traveling to Springfield, MO for a scheduled meetings, Mr. Hayes commented that his ex-wife had large nipples. During our drive he called me silver dollar in reference to my nipples. In addition, Mr. Hayes stated his ex-wife would flash her breast to truckers while traveling on the Highway. Once this statement was made, Mr. Hayes would nudge my arm each time we passed a trucker, he would smile and chuckle. This was egregious behavior and persisted the entire ride to Springfield. I would state no, but Mr. Hayes ignored my request to stop. During the drive, Mr. Hayes stated his ex-father-in-law would have sex with chickens and his ex-wife would have to show her breasts to her father each night before he would grant her permission to go to bed. Once we arrived to Springfield, we had stopped at a parking lot to meet with a Seneca field technician to deliver equipment. While we were waiting for the technician, Mr. Hayes forced a picture in front of my face that was on his

        smartphone. The picture was of his wife's bare breasts. I quickly turned my head away and asked why he showed me that photo. Mr. Hayes kept repeating, don't tell my wife. During our drive back from Springfield, Mr. Hayes would ask if I like black penis (reference to African American). Although I told him to stop, he continued to ask me this question repeatedly.

XII. On approximately May 15, 2014, on a drive to Oklahoma City for a meeting with FCC Environmental, Mr. Hayes stated he knew personally the Oklahoma DOT and Highway Patrol. Mr. Hayes stated that in past employment he ran transport trucks and due to his personal relationship with the Oklahoma DOT and Highway Patrol, his trucks would be allowed to speed without worry of being pulled over. Mr. Hayes informed me that there were instances when he would alert the Highway Patrol to pull over people he had grudges against. In addition, Mr. Hayes stated a person tried to carjack his truck, therefore, he stabbed the perpetrator in the neck and drove off. When we arrived to our destination at FCC Environmental, the Regional Manager told us he came in from Texas and fired the Oklahoma City operations manager and sales representative because they had been conducting side business. These two individuals were the people Mr. Hayes expected to meet with during our meeting. I quickly realized running side deals was more than likely on Mr. Hayes agenda. FCC Environmental had all the same service offerings as Seneca Companies. Later, Mr. Hayes would approach and encourage me to participate in unethical business practices. I refused. I reported this to Human Resource in my initial complaint. During our ride home from Oklahoma City, Mr. Hayes told me he had once been questioned by the FBI for transporting hazardous waste across state lines without proper paperwork. This was with a previous employer and he indicated this took place in California. While telling me this story, Mr. Hayes scoffed and chuckled. He had indicated that nothing became of the FBI questioning.

XIII. In mid May 2014, I was discussing a project, Mr. Hayes interrupted our business conversation to tell an inappropriate story. The story was graphic regarding Mr. Hayes' penis, skinny dipping with his wife and her friend. Mr. Hayes told me he walked his penis past the friends face when he walked up the steps to retrieve a drink while in a swimming pool. He stated later that night while engaging in sexual activity with his wife in the guest bedroom; the friend entered the room and watched the couple have sex. I attempted to intervene and stop Mr. Hayes' statements. Mr. Hayes continued to tell this inappropriate story despite my objections and visible discomforted. I immediately left his office. On more than one occasion, Mr. Hayes invited me to his home to swim in his pool. His repeated request continued until I reported his behavior to Seneca Companies Human Resource department.

XIV. On approximately May 28, 2014, I met with Mr. Hayes and lead field technician, Mr. Shultz, to discuss scope of work for Hiland Dairy in Chandler. During our discussion, Mr. Hayes interrupted our conversation and changed the subject to himself. Mr. Hayes told a story regarding his ex-wife and her parents. They were all outside on the deck drinking. Mr. Hayes explained that his ex-wife walked up to him and in front of her parents, she pulled down his pants and proceed to give him oral sex. I stated the story was disgusting and I requested Mr. Hayes to stop. I attempted to take the conversation back to scope of work for the Hiland dairy tank cleaning quote. Mr. Hayes expressed anger and hostility.

Mr. Hayes pointed his finger towards me and stated he was done with me. Mr. Hayes ordered me out of his office. I gathered my belongings and left immediately.

XV. On approximately May 29, 2014, I phoned Mr. Biellier, the GM of the Seneca Companies Waste Solutions. Mr. Beillier was a very close friends with Mr. Hayes. Mr. Biellier was instrumental with hiring Mr. Hayes as branch operation manager for the Tulsa office. At that time, Mr. Biellier was both Mr. Hayes and my direct supervisor. I declined to speak of the sexual offensive behavior of Mr. Hayes due to the uncomfortable nature. However, I did discuss with Mr. Biellier the overall mistreatment I was experiencing to include the lack of project assistance, Mr. Hayes' hateful attitude towards me and that I was ordered out of Mr. Hayes office. I asked Mr. Biellier to intervene and speak with Mr. Hayes. I stated to Mr. Biellier that I thought Mr. Hayes would be more receptive with the conversation since they were friends and I felt if I approached Mr. Hayes with my concerns, it may result in a hostile work environment.

XVI. On approximately May 30, 2014, I received a phone call from Mr. Hayes informing me that he had taken the IC Bus contact to lunch on approximately May 29, 2014. He state he took Mr. Shultz (Seneca lead field technician) instead of me because it was an operational meeting. In addition, Mr. Hayes and Mr. Shultz participated in a plant tour. The meeting was originally scheduled with the customer for May 25, 2014. However, prior to May 25, 2014, Mr. Hayes pulled me into his office and stated the customer had requested to reschedule the lunch meeting and he would contact me once he received confirmation from the customer on a new date/time. Mr. Hayes did not inform me of the reschedule date, therefore, I was denied the opportunity to participate in the IC Bus meeting/plant tour.

XVII. On approximately July 7, 2014, Mr. Biellier traveled to Tulsa for a technical training scheduled with Leighton O' Brien. I took the opportunity to speak with Mr. Biellier in private to discuss the overall mistreatment I continued to experience by Mr. Hayes. Once again I asked Mr. Biellier for assistance and if he would speak with Mr. Hayes. I insisted I wanted the mistreatment to end. Instead, Mr. Biellier encourage me to speak with Mr. Hayes on my own. Mr. Biellier suggested I use profanity when I speak with Mr. Hayes and to be tough with my approach. He insisted this would help me to get my point across to Mr. Hayes. I was hesitant but eventually agreed to speak with Mr. Hayes without Mr. Biellier's assistance. I did not want to speak with Mr. Hayes in the suggested manner and I did not have the opportunity to speak with Mr. Hayes regarding my concerns.

XVIII. On approximately July 8, 2014, the Tulsa branch had technical training scheduled with Leighton O' Brien, for a new Seneca Companies service truck. I received approval from Mr. Biellier to attend the training. The training was scheduled for the morning from 8:30am through 10:30am. I arrived to the Tulsa branch for the 8:30am training and Mr. Hayes left the building. The training was delayed for two and half hours until Mr. Hayes returned. I had a pre-scheduled customer appointment set for 11:30am. Consequently, I was unable to attend the technical fuel polishing training due to Mr. Hayes disappearance. Later that same day I requested from Mr. Hayes the address for the on-site fuel polish training that would take place the following day. This training was set for our field technical team to utilize the new truck at a customer site in Broken Arrow,

|      |      |
|------|------|
|      | Oklahoma. I made multiple requests for Mr. Hayes to provide the address. Mr. Hayes ignored my requests. After several attempts, a Leighton O' Brien representative handed me a piece of paper with the address. |
| XIX. | On approximately July 9, 2014, I arrived early the morning of the onsite technical training in Broken Arrow. The Leighton O' Brien team and Seneca Companies field technician team arrived shortly after. Mr. Hayes and Mr. Biellier finally arrived approximately 30 minutes later. During the lunch break; I mentioned to Mr. Biellier that I took the AncestryDNA test and recently received my results. Both Mr. Biellier and I enjoy genealogy as we discussed my first day of employment with Seneca Companies. Mr. Biellier requested to see the results and I retrieved my phone from my vehicle. I pulled up the site on the internet and Mr. Biellier reviewed my ethnic breakout results. I did note that Mr. Biellier commented on each of my ethnic indicators with the exception of my European Jewish heritage. Mr. Biellier did not acknowledge, skipped over it and did not provide comments as he did with all the other indicators. Soon after, I put my phone away and we continued with the site project training. |
| XX. | On approximately July 10, 2014, Mr. Hayes said I am going to tell you a hypothetical story. Mr. Hayes stated that if he were to go over his supervisor's head to place a complaint; that the supervisor would undermine his credibility. And that Mr. Hayes would not blame him, because he did not follow the chain of command. Mr. Hayes promptly reminded me that the owner of Seneca stated that no one should ever tell Mr. Hayes no. And if Mr. Hayes was told no, that he needed to go to the owner. The demeanor of Mr. Hayes was hostile and threating. Since I had just placed a complaint to Mr. Biellier regarding Mr. Hayes' mistreatment toward me only days earlier; I believed his statement was a threat and a warning that he would attempt to undermine my credibility. I later reported this event when I placed the formal complaint with the Seneca Companies Human Resource department on approximately October 20, 2014. |
| XXI. | On approximately July 11, 2014, Mr. Hayes approached me and told me an offensive Jewish joke. When he finished he stared at me disgustedly and stated "you just don't always know who someone really is". Mr. Hayes walked away. For several days after this event, Mr. Hayes would tell offensive Jewish jokes and stare at me when finished. He did this in the presence of others. The only person within Seneca Companies I shared my AncestryDNA results was Mr. Biellier. |
| XXII. | In September or October 2014, Mr. Hayes proposed I sell totes to be cleaned and recycled, stating I should run the project through Seneca Companies. He stated that I would get my cut on the frontend and Seneca Companies would get its cut on the backend. Mr. Hayes gave an example suggesting I could make an extra $2,000.00 if I sold the recycled totes for $20.00 each. Mr. Hayes commented that this would help me to get closer to completing my home projects by providing me with extra revenue. Mr. Hayes discussed this proposition with me in the presence of Mr. Charles. I did not consider his proposition and I reported this to the Seneca Companies Human Resources director of in my formal complaint approximately October 20, 2014. |
| XXIII. | In September or October 2014, Mr. Hayes told me a story that he was instrumental in getting two sales personal and an operational manager fired with a company he had previously worked. For approximately two weeks I experience Mr. Hayes stating "I get |

people fired, I just have that ability. I don't understand, I get people fired". These comments would take place most often when I entered his office. I reported this in my formal complaint approximately October 20, 2014 to the Seneca Companies Human Resources director.

XXIV. On approximately October 20, 2014, I continued to experience the mistreatment from Mr. Hayes. I approached a female coworker and I told her I was considering calling Seneca Companies Human Resources department to place a complaint regarding Mr. Hayes' behavior. The female coworker and I had a previous conversation regarding the mistreatment and inappropriate behavior of Mr. Hayes. This female coworker had similar experiences, however, she explained she felt protected by her manager. The female coworker did not report directly to Mr. Hayes as I did, nor did she work in the same division. However, she did work in the Tulsa branch. She advised me not to go to Human Resources because it is his word against mine. She stated I would be fired. I considered her advice, however, I made a decision to move forward with my complaint. On approximately October 20, 2014, I placed a formal complaint with Seneca Companies Human Resources Director, Mr. Puffer. In my complaint I outlined the unwanted sexual harassment, general mistreatment, unethical business practices, hostile work environment and incorrect cost allocations to my projects.

XXV. On approximately October 24, 2014, Mr. Biellier approached me in the Tulsa office and stated we were going to Mr. Hayes office to have a chat with Mr. Puffer. This took place only a few days after my complaint with Mr. Puffer. I felt scared and unprepared to address Mr. Hayes. I expressed my hesitation to Mr. Biellier. Mr. Biellier stated that Seneca Companies was a privately held company and they wanted to squash it, and be done with it. Mr. Biellier informed me that Mr. Hayes had confessed to the sexual inappropriate comments and stories as well as the visual sexual harassment photo of his wife's nude breasts. I was instructed to follow Mr. Biellier to Mr. Hayes' office. Mr. Biellier requested that I sit next to Mr. Hayes at his desk. Mr. Puffer was on a video conference on Mr. Hayes computer. I felt that Mr. Puffer reprimanded Mr. Hayes as well as me due to his body language and voice tone. Mr. Puffer told Mr. Hayes to apologize. Mr. Hayes stated he was sorry and that is was all just a joke and that he was only joking. Mr. Hayes said while smiling and laughing.

XXVI. On approximately October 28, 2014, I had a meeting scheduled with Koch Nitrogen in Enid, Oklahoma. Arriving in Enid, I was pulled over by a highway patrol and was told to exit my vehicle and instructed to sit in the front seat of the officers' vehicle. The officers' demeanor was very stern and he asked me what I was doing in these parts. I explained I had a scheduled appointment with Koch Nitrogen. He handed me a warning ticket for speeding and stated "this is a warning...this time." He repeated this statement again as I exited his vehicle. I arrived to the Koch Nitrogen facility early and while in my vehicle, I was approach by a Koch Nitrogen security guard. I explained to the security guard I had a scheduled appointment with Koch Nitrogen employee. The security guard told me a driver with the Maverick trucking company had alerted the guard of my vehicle and stated I was suspiciously driving around. Maverick, was a trucking company that Seneca Companies had subcontracted to perform specific work for Koch Nitrogen. I entered the Koch facility and overheard my customer contact state to the security guard that Mr.

|        |                                                                                                                                                                                                                                                                                                                                             |
|--------|-|

Hayes had cancelled my scheduled meeting. Therefore, he would be unable to meet with me. When I returned to my vehicle, I had a voicemail from Mr. Hayes. In the voicemail, Mr. Hayes called to let me know the customer contact cancelled the appointment. I realized this was a false statement because I had just overheard the opposite to the security guard. Later that afternoon I left Enid and entering highway 412. A Maverick company truck approach the side of my moving vehicle and crossed in front of my vehicle only inches from my hood and speed down the interstate.

XXVII. On Approximately January 19, 2015, I received a call from Mr. Puffer. He stated he wanted to circle back around from my complaint that took place in October of 2014 regarding Mr. Hayes. Mr. Puffer wanted me to acknowledge the investigation of my complaint was handled appropriately. I stated that I was disappointed with the way the complaint was handled in resolution. I expressed to him that I thought after my initial complaint was placed, I would have a private follow-up conversation with Mr. Puffer to discuss next steps. Instead, I was approach by Mr. Biellier to follow him into Mr. Hayes office and that "we were going to have a chat with Mr. Puffer". I expressed that it was extremely difficult for me to place the complaint and I felt that a private follow-up with me would have been more appropriate. Mr. Puffer admitted that they may have not handled it the best way but the thought process at that time was to just deal with the situation to put it to rest. I suddenly felt bad for being honest and told Mr. Puffer it was fine. Mr. Puffer asked me again if I felt it was handled appropriately and I agreed. I also stated to Mr. Puffer that Mr. Hayes had not made additional inappropriate comments since my complaint. I did include however, that Mr. Hayes had consistently added erroneous costs to my projects since I had placed my original complaint against him. The false costs/charges had been added to my customer time and material (T&M) projects to include false over time, false equipment fees, false technician fees and additional materials. The erroneous charges are unfounded and incorrect. The charges would be added by Mr. Hayes without my review and typically after the project had invoiced. Several months would pass and I would receive a payback on my commission statement. Therefore, the extra costs would diminish my project profitability and overall revenue. I told Mr. Puffer that Mr. Hayes would ignore my requests to explain or show documentation for these false charges. I would email Mr. Hayes regarding the extra charges for each project and he would not respond. Each and every time this happened, I had to escalate the situation to Mr. Biellier and the accounting department to have corrections made. However, not all would be corrected and I would have to take the commission payback. I also stated that Mr. Biellier was very aware of incorrect project cost allocations because I had been vocal with my concerns. Mr. Puffer asked me if I thought the cost discrepancies were intentional on behalf of Mr. Hayes and I stated yes.

XXVIII. On approximately January 26, 2015, Mr. Hayes informed me that all future water transport projects for Koch Nitrogen in Enid would run under a house project. Therefore, I would no longer receive commissions on these projects, however, Koch Nitrogen would remain assigned to me. Mr. Hayes stated the decision was made by upper management due to the inability of the sales person to manage the account effectively. Mr. Reuter, Seneca Companies Waste Solutions field supervisor, was sitting in the office when Mr. Hayes made his comment. I requested a conference call with Mr. Risewick, Seneca

        Companies Vice. President of Sales, Mr. Biellier, Mr. Hayes and Mr. Reuter to confirm and address the allegations of my inability to manage Koch Nitrogen. Although I invited Mr. Reuter to participate in the conference call, he was asked to not attend by Mr. Hayes. Mr. Hayes denied his statement regarding my inability to manage the Koch Nitrogen account. I was unable to corroborate his statement because Mr. Reuter did not participation to the conference call. However, Mr. Risewick and Mr. Biellier did confirm Koch Nitrogen in Enid would remain my account, but the water transport projects would be run as house projects. During the conference call, I informed Mr. Risewick and Mr. Biellier of the numerous occasions Mr. Hayes had cancelled scheduled meeting with Koch Nitrogen as well as other small projects that I had been scheduled to participate only to be later rescheduled by Mr. Hayes without my knowledge nor participation. In addition to cancelling appointments, I stated Mr. Hayes refused to allow me to work on the water transport projects. The Koch Nitrogen water transport projects made up a significant portion of my 2015 sales budget. Even though I would not receive credit for future water projects in 2015, the revenue numbers were not adjusted from my 2015 budget. In 2014, Mr. Biellier and I had discussed my 2015 budget. Mr. Biellier stated I had nothing to worry about because I showed progress and activity. He also stated that the first year is used as a ramping period. I started my employment with Seneca Companies on April 7, 2014 and I was terminated on April 2, 2015. In addition to Mr. Hayes adding erroneous cost allocations to completed projects, thus lowering the overall profitability, I was subjected to commission payback. For example, on approximately May 8, 2015, I did receive my vacation pay from Seneca Companies, however, $325.17 was deducted due to commission payback. On approximately April 8, 2014, Mr. Biellier stated to never take credit nor receive commissions on a project that was not assigned to me. That this would be immediate termination, no questions asked. After my complaint to Seneca Companies Human Resources Department in October 2014 and on three separate occasions, Mr. Hayes had submitted a commission payout for me with accounts that had not been assigned. Therefore, I had reported this immediately to Mr. Biellier and the commission department for removal.

XXIX. On approximately January 27, 2014, Mr. Hayes openly campaigned to Mr. Biellier and Mr. Risewick requesting for Mr. Haggard, Seneca Companies Petroleum sales representative, to receive credit and commissions for a project I had performed for Love's convenient store. Mr. Hayes also campaigned for Mr. Haggard to take over a large proposal I had been working on for EZ Go convenient store.

XXX. On approximately March 5, 2015, Mr. Hayes told a story regarding a sales person, Mr. Sanchez, that he once worked with at a former company. According to Mr. Hayes, Mr. Sanchez would meet once a month with a vendor. Instead of meeting with customers, Mr. Sanchez and the vendor would drink and party it up. Mr. Hayes indicated this took place during business hours and that Mr. Sanchez would expense to the company. Eventually, Mr. Sanchez was fired from his position due to this activity. Mr. Hayes indicated that he alerted the company of Mr. Sanchez's behavior and activity to include expensing the company non-customer meals and entertainment. When Mr. Hayes finished this story, he stated that Mr. Sanchez would be giving me a call. I asked "why would Mr. Sanchez be calling me"? Mr. Hayes did not respond, he stared at me

|  |  |
|---|---|
|  | expressionless. This took place with Mr. Reuter in the room. For several weeks following this story, Mr. Hayes would approach me while I was in the branch office and he would state "chardonnay...wine" "Chardonnay...wine." He would repeat this over and over. |
| XXXI. | On approximately March 6, 2015, Mr. Reuter and I had a plant tour with a prospected customer in Arkansas. Prior to heading back to Tulsa, I pulled into a gas station to fuel my vehicle. At the gas station, Mr. Reuter suggested I purchase beer for the ride home. I laughed it off as a joke. Moments after leaving the gas station, Mr. Reuter phoned Mr. Hayes. When Mr. Reuter got off the phone, he stated that Mr. Hayes had encouraged him in a previous phone conversation to convince me to purchase beer for the road. He phoned Mr. Hayes to let him know I refused to purchase beer. |
| XXXII. | On approximately March 23, 2015, I submitted a ticket to the Seneca IT department requesting an investigation into my missing account/prospect customer information from the CRM sales database (Oracle Sales Cloud). The CRM housed the account/prospect information with all my communication to include prospect contact information, detailed notes, phone call log registry, written email attachments and my overall strategy I had enter during my tenure with Seneca Companies. Mr. Rice from the IT departed conducted an internal investigation and confirmed that these accounts had been deleted by someone within Seneca Companies. Upon further investigation, most of the prospects had been reentered under Mr. Charles and Mr. Haggard. Mr. Hayes did admit to me that he had giving Pryor Chemical to Mr. Charles, although this was a prospect I had entered in the CRM as well had several interactions. Mr. Hayes stated that Pryor Chemical phoned the offices requesting to speak with me. Because I was not in the office, Mr. Hayes gave the information to Mr. Charles. Mr. Hayes laughed when he told me what he had done. |
| XXXIII. | On approximately March 24, 2015, the President and COO of Seneca Companies, Mr. Nelson as well as Mr. Biellier arrived from Des Moines to Tulsa for a Branch Meeting. Approximately the morning of Tuesday March 24, 2015, Murray Nelson gave a presentation to the Tulsa branch staff, consisting of the waste solutions and petroleum division personal. Mr. Nelson stated he would never tell a Seneca Companies operational manager how to run his office. Immediately following his statement, Mr. Biellier and Mr. Hayes left the room. Several hours later Mr. Biellier and Mr. Hayes arrived back to the office, at that point I was informed they had left to meet with Koch Nitrogen in Enid. The Koch Nitrogen account was assigned to me and I was not told of the meeting. Mr. Biellier approached me and I asked him if he had time to discuss information on a prospect. Mr. Biellier's response was "what now"? He stated, "So, you like vodka and orange juice". I responded "no." Mr. Biellier commented, "Yea, you don't drink much." This comment was made with Mrs. Atchley in the room. |
| XXXIV. | On approximately March 27, 2015, I was in office finalizing a large quote for EZ Go convenient stores. I was approach by Mr. Reuter, Mr. Shultz and Mr. Disney, Seneca Companies project manager, and the three coworkers encourage me to drink from a mason jar with a clear liquid. They explained it was moonshine that was kept in the office and belonged to Mr. Haggard. I declined to take a drink, however, my coworkers proceeded to drink from the jar. Moments later, Mr. Reuter commented that Mr. Hayes was in Atlanta, Georgia and he started to talk about Mr. Hayes. He stated Atlanta had |

the best strip bars, however, Mr. Reuter use a different term. I quickly changed the subject, as instructed by Seneca Companies Human Resources director. I left the office shortly after these events.

XXXV. On approximately March 30, 2015, I contacted Mr. Taber with the Seneca IT department regarding a ticket I submitted for a file that appeared to be deleted from my email account, however, showed in my outlook on my iPhone (under a deleted folder). I knew I had not deleted this folder. I thought it was odd I could see it only on my iPhone outlook email but it did not appear on my laptop email. Earlier in the month of March 2015, an email was sent from Seneca Companies corporate office that some company owned laptop computers and company owned cell phones had been compromised with malware. I did respond to the email and requested further explanation because my personal laptop had also displayed similar attributes as outlined in the email from corporate. In my email response, I inquired if this malware had the capability to infect other equipment that shared a network. I often worked from my home office conducting Seneca Companies business. Therefore, my company owned laptop shared my home internet network with my personal computer. The Seneca Companies IT department did respond to my email, however, the respondent did not provide further information. The email response stated I needed to find a computer expert locally and to handle on my own. It was not Seneca Companies' responsibility.

XXXVI. On approximately March 31, 2015, Mr. Hayes sent me an email requesting we reschedule two of my projects I had scheduled for approximately April 2, 2015 due to emergence hydro blast request in Arkansas. The email stated he wanted to send the Tulsa technical crew and that my projects needed to be put on hold. I received Mr. Hayes' email while I was in the office. I approached Mr. Hayes and reminded him of the Seneca Companies policy was to never reschedule a project for any reason, no matter how big or small the customer project. Mr. Hayes laughed and walked away.

XXXVII. On approximately April 1, 2015, I had suspicions that my work email was compromised. Examples include but not limited to emails that had disappeared from my outlook inbox and an additional email folder I had not created appearing in my email account. I phoned the Seneca Companies IT department and I spoke with Mr. Taber regarding my email concerns. Mr. Taber stated he did not feel that my email account had been compromised. I asked Mr. Taber if he would give me permission to set my cell phone back to factory and he gave me permission. If he was right, this process would sync my computer outlook with my iPhone outlook and elevate my issue. I set my phone to factory and I ran a malware scan on my company laptop. Around 4:30pm, I received an email from Mr. Hayes requesting I come into the office the following morning on approximately April 2, 2015 prior to my scheduled appointments in Arkansas.

XXXVIII. On approximately April 2, 2015, I sent Mr. Hayes an email on my phone outlook and stated I was working with the IT department due to email issues. I requested if it would work with his schedule to meet in the office at 11:00am. I continued to correspond with Mr. Taber and Irequesting the retrieval of my deleted emails from approximately March 27, 2015 through April 2, 2015. Mr. Taber responded that I had the ability to retrieve my deleted emails and provided me with instructions. I followed the instruction and I discovered a hidden folder attached to my email account with hundreds of duplicate

emails as well as duplicate deleted emails.  I also discovered emails I had not previously received.  This file not only duplicated my incoming and outgoing emails, I discovered deleted folders and files.  My company email account had been compromised.  I took photos of my findings and promptly emailed the photos to Mr. Taber.  Mr. Taber sent a response asking if I had setup permission in my email to duplicate ingoing/outgoing emails and to delete emails.  I responded no, I had not.  After my final email to Mr. Taber, I packed up my laptop and headed into the office for my meeting with Mr. Hayes.   When I arrived, Mr. Hayes instructed me to go into his office and to sit at his desk.  On Mr. Hayes desk was his laptop with Mr. Puffer from Seneca Companies Human Resources department on video conference.  Mr. Puffer informed me a decision had been made to terminate my employment with Seneca Companies immediately and this decision was due to my low sales numbers.   I asked Mr. Puffer if there were any additional reasons for my termination and Mr. Puffer stated no.  Mr. Puffer stated I was the most expensive sales person within Seneca Companies and noted my salary, car allowance and business expenses including meals and entertainment.  I responded to Mr. Puffer that my meals & entertainment are minimal to non-existent.  I requested Mr. Puffer provide me with copies of such expenses and he responded no, he would not provide this documentation.  Mr. Puffer stated in addition to my expenses, my gross profit on my projects were low, thus causing me to be more expensive and contributing to the reason for my termination.   Mr. Puffer said a decision had been made to make Koch Nitrogen in Enid a house account. Mr. Puffer continued to state that since there is no other business in Tulsa, there is no reason to have a sales person in the Tulsa Market. (Although Seneca Companies did hire my replacement approximately June 2015).  Mr. Puffer stated that if I file for unemployment and if it is approved, I will get my vacation pay but only if unemployment is approved.  He noted a new Seneca policy that had been implemented approximately December 2014 regarding the payment of vacation pay.  I had several meetings scheduled for that afternoon in Arkansas and I requested if Seneca Companies could contact the companies.  Mr. Reuter was present during my termination and stated he would take on the responsibility to cancel my appointments.  Mr. Puffer commented that my request spoke to my character.  While Mr. Reuter escorted me to my vehicle, he asked me if I noticed Mr. Hayes had left the building.  I had not.  Mr. Reuter stated that he was asked by upper management to attend my termination and to escort me from the building, because Mr. Reuter would be the least likely person I would hit or cause physical harm.  I was the only woman sales person employed by Seneca Companies upon my hire and termination from the company.  I was the only sales person within the Seneca Companies Waste Solutions division to report to an operational branch manage.